# BRUNE & RICHARD LLP

80 Broad Street
New York, New York 10004
(212) 668-1900 phone
(212) 668-0315 fax
www.bruneandrichard.com

New York ✦ San Francisco

December 14, 2007

**BY HAND**

The Honorable Harold Baer
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 2230
New York, NY 10007

Re:   **United States v. Aharon Weichselbaum, 07 Cr. 540 (HB)**

Dear Judge Baer:

We write on behalf of Aharon Weichselbaum, whom we know as "Roni." On June 13, 2007, Roni pleaded guilty to a one-count information charging him with mail fraud. He is to be sentenced on December 27, 2007.

Roni acknowledges having taken client funds from the small broker-dealer business where he was employed. He is extremely remorseful, and fully recognizes the hardships that he has imposed on others. As described in more detail below, he has serious psychological issues, including an addiction to gambling, which he has taken responsible steps to address.

The Probation Department recommends a sentence of 18 months, significantly below the guideline range. We appreciate the Probation Department's recognition that a guideline sentence is not warranted. We respectfully propose an alternative sentence: a split sentence of 12 months, with 6 months in prison and 6 months in home detention. For the reasons detailed below, this sentence would accord with the law's directive that a court impose "'a sentence sufficient, but

19718

The Honorable Harold Baer
December 14, 2007
Page 2

not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*,

No. 06-6330, 2007 WL 4292040, at *10 (U.S. Dec. 10, 2007) (*quoting* 18 U.S.C. § 3553(a)).

1.    <u>Background</u>

Roni's parents left Germany in the 1930s and settled in Israel. Roni was born in Tel Aviv

in 1955. From early childhood, Roni was significantly overweight, and bore the brunt of teasing

from other children. When Roni was 13, his father suffered a stroke as he drove to work and

died soon after. His father's incapacitation and death affected Roni profoundly, and he could not

shake a feeling of overwhelming hopelessness.

Although his family was of modest means, the combination of a pension and German

reparations allowed Roni and his twin brother to attend yeshiva. After graduating from yeshiva,

Roni completed his Israeli military service. He then met his wife Shirley, a New York native.

They soon moved to New York, where they were married.

Roni attended Brooklyn College, where he graduated with an accounting degree. From

1981 until his arrest, he worked as a stockbroker for the small firm Paul L. Forchheimer & Co.,

Inc.

Roni and Shirley have two children: their daughter Liat, 27, is the manager of an art

gallery, and their son Oren, 23, is a graduate student at New York University. Both children live

at home with Roni and Shirley. Shirley works as a teacher at a Jewish day school. Roni has

been unable to find new employment.

The Honorable Harold Baer
December 14, 2007
Page 3

Those who know him best know Roni as "a man with a heart of gold." (Letter to the

Court from Shirley Buls Weichselbaum, attached hereto as Exhibit 2, at 1.) The letters submitted

on his behalf recount numerous examples of Roni's support for loved ones in their times of need.

When his step-father was dying of cancer, Roni flew to Israel to be with his mother and help care

for her husband; when his father-in-law was battling Alzheimer's disease, Roni sat by his side so

that he was not alone (*id.*); when his wife's cousin Sylvia was diagnosed with breast cancer, Roni

helped her pay for medical supplies and provided food when she was unable to cook for herself

(Letter to the Court from Sylvia Navon, attached hereto as Exhibit 3, at 1); and when his cousin

Lorraine's mother passed away, Roni was there, providing constant care and support (Letter to

the Court from Lorraine Peltz, attached hereto as Exhibit 7, at 1).

As his daughter Liat explains, Roni is a man "who would do anything he can, not only for

his children and family, but for his friends and colleagues as well." (Letter to the Court from

Liat Weichselbaum, attached hereto as Exhibit 4, at 1.) He "has helped out family members who

have been sick, opened the door to his house, and practically given everything he had just so the

people he loves would be comfortable living their lives." (Letter to the Court from Oren

Weichselbaum, attached hereto as Exhibit 5, at 1.) Roni's cousin Lorraine describes him "as a

kind and honest man who wants only to help, to make better, to improve the lives and well being

of others." (Ex. 7, at 1.)

Roni has a close-knit family, of which he is an integral part. As his cousin James writes:

"Roni's infectious laugh, his pleasure in the company of family, his affection for good

discussion, his intellectual curiosity, and his love of new experiences all made him a leader in the

The Honorable Harold Baer
December 14, 2007
Page 4

things he did with us, and we are grateful to know him – he has changed our lives for the better."
(Letter to the Court from James Yood, attached hereto as Exhibit 6, at 1.)  His cousin Lorraine
describes Roni as a loving family member:  "It has really been a blessing to have such a loving
person in our life."  (Ex. 7, at 1.)  With Roni's outward "gusto for life," exuberance, and
"generosity of spirit," it is no surprise that he is so beloved.  (*See* Ex. 6, at 1; *see also* Ex. 2, at 1.)

Though he did not acknowledge it to his loved ones or even to himself, Roni has
struggled throughout his life with severe depression and ultimately with an addiction to
gambling.  As he later explained to the Probation Officer, he began to feel that his life was "out
of control" and that he was "drowning in [his] own stupidity."  (Presentence Investigation Report
¶ 47, at 10 [hereinafter PSR].)  Roni now sees that he turned to gambling as a way to deal with
his depression.  He started with blackjack, but soon moved on to video poker, well known to be
"a particularly addictive form of gambling."  (PSR at 22, *citing* Letter to the Court from Dr. Ivan
C. Balan, attached hereto as Exhibit 8, at 2.)  He would fly to Las Vegas, usually alone, and
spend days and nights at the video poker machines, with minimal food or sleep.  Roni recalls
himself as "an addict needing to get his fix."  During the return flight, he would "crash,"
overcome by feelings of worthlessness, guilt and depression.  (*Id.*, *citing* Ex. 8, at 1.)

In his first year of heavy gambling, Roni won approximately $50,000.  But soon, he
began to lose, and to lose heavily.  Roni began to embezzle from his firm and its clients.  At first,
Roni took only small amounts, but as the gambling losses grew so did his need for money.  He
began taking more and more to subsidize his addiction.  The line having been crossed, he also

The Honorable Harold Baer
December 14, 2007
Page 5

began to spend embezzled funds on himself and his family, all part of trying to fill the hole

caused by his profound sadness.

Despite Roni's attempts to conceal his theft, he always realized that there was no

escaping the consequences of his actions – he would eventually be caught. Still, he could not

stop. It was not until November 2006, with arrest imminent, that he was finally able to stop

gambling and obtain the help he had needed for so long.

In early December 2006, Roni began seeing Dr. Raphael Campeas, a psychiatrist with 23

years of experience at the New York State Psychiatric Institute, New York Presbyterian Hospital,

and Columbia University. Dr. Campeas diagnosed Roni with Pathologic Gambling and Major

Depressive Disorder and prescribed Lexapro, an anti-depressant, and Clonopin, an anti-anxiety

medication. (PSR ¶¶ 52-53, at 11; *see also id.* at 22, *citing* Letter to the Court from Dr. Raphael

Campeas, attached hereto as Exhibit 9, at 1.) As Dr. Campeas attests, Roni "has been taking

therapy very seriously, has responded well to treatment, and since ceased gambling." (*Id.* at 22,

*citing* Ex. 9, at 1.) In psychoanalysis, Roni has "worked hard to come to terms with the impact

of his illness and the impact his actions have had on his clients, his business, and his friends and

family." (*Id., citing* Ex. 9, at 1.)

Also since early December 2006, Roni has attended the Gambling Disorders Clinic at

Columbia University, a free clinic devoted exclusively to the intensive treatment of those dealing

with gambling disorders. The clinic offers cognitive behavioral therapy tailored to the particular

needs of those with gambling addictions and, for Roni, that treatment is helping. As Roni

explains it,

The Honorable Harold Baer
December 14, 2007
Page 6

> Therapy has taught me to fight [gambling] urges by focusing on the consequences of what I did. Instead of thinking of gambling as a pleasure, my therapy has taught me to think of what gambling has brought into my life and the pain and suffering I have caused to other people. My addiction will be a part of my life forever and something that I will have to fight for the rest of my life. I know that I will need therapy for the rest of my life. I have so many issues that I have never dealt with, and now is the time to deal with them, otherwise I will not consider myself a changed person.

(Letter to the Court from Aharon Weichselbaum, attached hereto as Exhibit 1, at 3.)

Roni has completely stopped gambling and has begun to gain insight into and control over the compulsion that had driven him. Dr. Ivan C. Balan, his psychologist at the clinic, states that Roni "has done well in treatment, has attended sessions consistently, and has worked very hard to understand and change his gambling behavior. As treatment [has] progressed, [Roni is] better able to understand his gambling behavior and the legal problems it has brought him." (PSR at 22-23, *citing* Ex. 8, at 3.)

Dr. Campeas and Dr. Balan agree: Roni's gambling addiction is what led him to commit his crimes. According to Dr. Campeas, "his Pathologic Gambling was the cause of his criminal behavior." (*Id.* at 22, *citing* Ex. 9, at 1.) Dr. Balan notes that "given the defendant's level of gambling addiction, it is not surprising that he eventually committed the crimes that led to the instant case." (*Id.* at 23, *citing* Ex. 8, at 3.)

While the early signs are promising, Roni's recovery from addiction will not be easy. Dr. Campeas reports that Roni "has struggled with the devastating impact his actions have had on his clients, his business, his friends and, most of all, his family. He will continue to struggle with these issues for the rest of his life." (Ex. 9, at 1.) Roni's friends and family recognize the seriousness of his problem, but they can see that he is moving in the right direction. His cousin

The Honorable Harold Baer
December 14, 2007
Page 7

Lorraine can "see how his therapy and recent interventions have helped him understand about

[his] abhorrent behaviors." (Ex. 7, at 1.)  Roni's daughter Liat has also observed the benefits of

her father's commitment to therapy:  "I have seen him come to realize more about himself than

he ever has before, what he has done, who he is, and how to bear the burden of the coming

years." (Ex. 4, at 1.)

Fortunately for Roni, his family is committed to supporting him through his recovery.

Speaking on behalf of the family, Roni's wife explains:  "we love and support Roni because we

know his goodness." (Ex. 2, at 1.)

2.    Roni's Criminal Conduct and Remorse

During his plea allocution, Roni expressed remorse, admitted that he knew his actions

were wrong, took responsibility for his crime, and explained his conduct as follows:

> On or about January 2001 through about December 2006, I was an employee of
> Paul L. Forchheimer, Inc., brokerage firm in Manhattan. I stole money from some of the
> firm's customers by cashing out their securities and transferring the money to my
> personal account. I then concealed my crime from these customers by sending them some
> false account statements. In one instance, on June 22, 2005, I sent an account statement
> through the U.S. Mail to Ernesto Riemann, a customer who lived in Switzerland, which
> indicated that he has significantly more assets than were actually in his account. I'm very
> sorry for what I've done. I know it was wrong and a crime.

(Plea Tr. 14-15, June 13, 2007, attached hereto as Exhibit 10.)

As Roni puts it, "Sorry is an understatement.  I have not yet found the correct word in this

language to express my feelings:  remorseful, shameful, begging for forgiveness." (Ex. 1, at 3.)

Roni's family and therapists all attest that Roni's contrition is both genuine and profound.  Dr.

Campeas reports that Roni "is very remorseful for his actions." (Ex. 9, at 1.)  His cousin James

"can attest to his profound remorse, and his determination to return to his family a changed man

The Honorable Harold Baer
December 14, 2007
Page 8

and one that will make a contribution to their lives and to society." (Ex. 6, at 1.) He describes

Roni as "sobered and chastened." (*Id.*) Roni's cousin Lorraine knows that he is "greatly

remorseful for the pain he has caused." (Ex. 7, at 1.) His son Oren has "no doubt . . . that [his]

father bears feelings of remorse" (Ex. 5, at 1), while his wife describes him as "painfully beyond

remorse" since "he has come to realize the terrible, tragic consequences of his actions and their

effects on his life, family and career" (Ex. 2, at 1).

    3.    <u>The Court Should Sentence Roni to a Split Sentence</u>

    For the reasons set forth below, the Court has the authority to and should sentence Roni

to a split sentence of 12 months, with 6 months in prison and 6 months in home detention.

    a.    <u>Applicable Sentencing Standards</u>

    Just this week, the United States Supreme Court has made clear that the district court has

the power, reviewable only for abuse of discretion, to fashion an individualized sentence, based

on "an individualized assessment [of] the facts presented," *Gall*, 2007 WL 4292116, at *7.   The

Supreme Court reaffirmed that "'[i]t has been uniform and constant in the federal judicial

tradition for the sentencing judge to consider every convicted person as an individual and every

case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the

crime and the punishment to ensue.'" *Id.* at *8 (*quoting Koon v. United States*, 518 U.S. 81, 113

(1996)).

    The Guidelines are "not mandatory" and are "only one of the factors to consider when

imposing sentence." *Id.* at *12.   The district court should "consider all of the §3553(a) factors to

determine whether they support the sentence requested by a party," *id.* at *7, and fashion "'a

The Honorable Harold Baer
December 14, 2007
Page 9

sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing,"
*Kimbrough*, 2007 WL 4292040, at *10 (*quoting* 18 U.S.C. § 3553(a)).  Serious consideration of
whether a non-custodial sentence would be sufficient is required.  As the Supreme Court has just
emphasized, "§ 3553(a)(3) directs the judge to consider sentences other than imprisonment."
*Gall*, 2007 WL 4292116, at *12.  While "custodial sentences are qualitatively more severe than
probationary sentences of equivalent terms[,] [o]ffenders on probation are nonetheless subject to
. . . conditions that substantially restrict their liberty."  *Id.* at *6.

    In addition to the § 3553(a) factors, a departure under U.S.S.G. § 5K2.13 "may be
warranted if (1) the defendant committed the offense while suffering from a significantly
reduced mental capacity; and (2) the significantly reduced mental capacity contributed
substantially to the commission of the offense."  The phrase "significantly reduced mental
capacity" is defined in Application Note 1 as "a significantly impaired ability to (A) understand
the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or
(B) to control behavior that the defendant knows is wrong."  U.S.S.G. § 5K2.13 cmt. n.1.

    The Second Circuit Court of Appeals has yet to articulate a standard for determining
when the causal connection between the offense and the impairment is sufficient.  But under any
interpretation of § 5K2.13, a direct connection between compulsion and crime is not required –
*i.e.*, Roni need not suffer from a compulsion to commit mail fraud for the departure to apply.
The text of the departure requires only that the "reduced mental capacity *contributed*
*substantially* to the commission of the offense."

The Honorable Harold Baer
December 14, 2007
Page 10

      b.     <u>The Court Should Downwardly Depart</u>

In the plea agreement, the government has allowed us to seek a downward departure pursuant to U.S.S.G. § 5K2.13, based on Roni's gambling addiction. The Court should grant a downward departure because Roni's addiction to gambling resulted in a significantly reduced mental capacity that "contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. The attached letters from Dr. Balan and Dr. Campeas establish that (1) at the time of the offense Roni was suffering from pathologic gambling and major depressive disorder, (2) that those disorders resulted in a significantly reduced mental capacity, and (3) that this reduced mental capacity contributed substantially to Roni's criminal activity.

There can be no doubt that Roni has been suffering from depression and gambling addiction for some time. Both Dr. Campeas and Dr. Balan attest to Roni's condition. Dr. Campeas reports that Roni "was diagnosed with Pathologic Gambling and Major Depressive Disorder," (Ex. 9, at 1), and Dr. Balan notes Roni's high "level of gambling addiction." (Ex. 8, at 3.) A specialist in the treatment of gambling disorders, Dr. Balan has described for Your Honor how Roni's gambling addiction and depression affected his mental capacity.

Compulsive gambling is a serious psychological condition. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 312.31 (4th ed. 1994). Compulsive gambling is considered an addiction. *See* Marc N. Potenza et al., *Gambling: An Addictive Behavior with Health and Primary Care Implications*, 17 J. Gen. Internal Med. 721, 722 (2002), *available at* http://www.pubmedcentral.nih.gov/picrender.fcgi?artid=1495100&blobtype=pdf. "A core feature of addiction is the continued engagement in a behavior despite adverse

The Honorable Harold Baer
December 14, 2007
Page 11

consequences.  This feature is generally accompanied by a diminished control over the

behavior."  *Id.*  Research into the brain activity of gambling addicts has shown "abnormal

functioning of [brain] regions previously found to be differentially activated in cocaine-

dependent subjects during exposure to cocaine cues."  *Id.* at 723.

      Roni's diminished mental capacity "contributed substantially" to his criminal conduct,

and a departure pursuant to § 5K2.13 is therefore appropriate.  Dr. Campeas leaves no doubt:  "In

my opinion, his Pathologic Gambling was the *cause* of his criminal behavior."  (Ex. 9, at 1

(emphasis added).)  This opinion is not speculation – it is based on 23 years of professional

experience and over 7 months of personally treating Roni for gambling addiction and depression.

Dr. Balan agrees that Roni's addiction "dr[o]ve[] the behavior and in the pursuit of a 'fix,' the

addict's [Roni's] judgment is often compromised."  (Ex. 8, at 3.)  Accordingly, in light of Roni's

gambling addiction, "it is not surprising that he eventually committed the crimes that le[]d to his

being before you."  (*Id.*)[1]

      Based on this strong connection between Roni's diminished capacity and the relevant

criminal conduct, the Court should downwardly depart.  Under § 5K2.13 "the extent of the

departure should reflect the extent to which the reduced mental capacity contributed to the

---

[1] *United States v. Kim,* 313 F. Supp. 2d 295 (S.D.N.Y. 2004), is not to the contrary.  In *Kim,* the
district court declined to depart because, while the defendant's post-traumatic stress disorder
caused a desire to appear financially successful, the court concluded that the disorder was
insufficiently connected to the defendant's criminal activity (forging checks to pay credit card
bills).  313 F. Supp. 2d at 296-97, 299.  In contrast, Roni's gambling addiction "was the cause of
his criminal behavior," (Ex. 9, at 1), and was in fact a *direct symptom* of his condition. (Ex. 8, at
2.)

The Honorable Harold Baer
December 14, 2007
Page 12

commission of the offense." Based on the severity of Roni's gambling addiction and his
continued progress in therapy, a significant departure is appropriate.

*United States v. Ribot*, 97 F. Supp. 2d 74 (D. Mass 1999) (Gertner, J.), decided before the
Supreme Court made clear that the guidelines were advisory, is nonetheless instructive. Like
Roni, Alfredo Ribot was convicted of a crime involving embezzlement; also like Roni, Ribot
suffered from addiction and a major depressive disorder. *Id.* at 78. In a careful and thorough
opinion, Judge Gertner granted a downward departure under § 5K2.13, noting that Ribot's
psychiatrists "suggest that this condition contributed to Ribot's offense, that it significantly
impaired his judgment and his ability to control his behavior. It resulted in Ribot's doing what
he had never done before – embezzle money . . . ." *Id.* at 83. In determining the appropriate
degree of the departure, Judge Gertner concluded that "the appropriate sentence is one that
enables Ribot to continue his treatment." *Id.* She stressed that Ribot was being treated by two
therapists "working in tandem," and that his "apparent success" thus far should not be
interrupted by a prison term that would result in delay and an alteration of treatment. *Id.*
Accordingly, Judge Gertner downwardly departed to a guideline range of 6 to 12 months, *id.* at
83-84, and an ultimate sentence "of thirty-six months of probation, six months of which is in
home detention," *id.* at 85.

The parallels to Roni's case are striking. He too had never committed a crime before he
became addicted; he too is showing progress in treatment; and he too is facing a significant
prison term that would represent a significant obstacle toward recovery. Roni recognizes that his
actions were wrong and deserving of punishment. But the need for punishment must be

The Honorable Harold Baer
December 14, 2007
Page 13

informed by the causes of Roni's actions and the steps he has taken over the past year to confront

those causes.

A downward departure is appropriate. As in *Ribot*, the proposed sentence would allow

Roni to continue his cognitive behavioral therapy at the Gambling Disorders Clinic at Columbia

University without lengthy interruption. This is precisely the treatment that has been recognized

as effective for individuals suffering from gambling addiction. *See* Potenza et al., *supra*, at 726.

At Columbia, under the care of two doctors who have already forged a relationship with Roni,

Roni has already made progress. It is in society's interest to allow Roni to continue to make that

progress.

4.     The § 3553(a) Factors Also Support a Lesser Sentence

Roni has no prior offenses. He has never before found himself on the wrong side of the

law. He is a good man; and as the letters submitted on his behalf show, he provides happiness,

love, and support to his family and friends. Roni understands the serious nature of his crime, and

he is prepared to accept the consequences. His struggles with depression and addiction will

continue for the rest of his life, but with the support of his family and professional help, it is a

struggle he can overcome. Indeed, he has already begun to do so. His doctors note the

seriousness with which he is taking his therapy and the progress he has made.

A lengthy prison sentence would no doubt make Roni's battle with depression that much

more difficult, because he will be separated from his family and his treating doctors – the two

things most important to his recovery. But even apart from his mental health issues, Roni's

numerous physical ailments would make a lengthy prison sentence exceptionally difficult. He is

The Honorable Harold Baer
December 14, 2007
Page 14

quite obese. He has undergone two spinal surgeries, one in 1999 and one in 2003, the latter of

which resulted in partial paralysis and a significantly limited ability to use his neck. (PSR ¶ 44,

at 10.) In 2000, he had to undergo additional surgery, this time to remove his gall bladder. (*Id.* ¶

45, at 10.) His medical conditions prevent him from lifting any heavy objects. (*Id.* ¶ 44, at 10.)

In addition to his depression and anti-anxiety medication, Roni takes medication for high blood

pressure and anxiety. The combination of these health problems – especially when considered in

connection with his depression – adds to the already onerous punishment a lengthy prison

sentence would represent.

Roni is not a danger to the public. As detailed above, the criminal conduct that brought

Roni before this Court was substantially caused by his depression and gambling addiction. For

the months Roni has been receiving professional help for those conditions, Roni has been a

responsible patient and both of his doctors report that he is progressing well. Roni's family has

been uniformly supportive. His son Oren has already observed many positive strides "thanks to

the help of both therapy and the loving family around him." (Ex. 5, at 1.) Roni's dedication to

therapy is a testament to his own recognition that he needs to change, and that change will

require ongoing help given the seriousness of his condition. Roni is getting that help, and as a

result he will not engage in this or any other kind of criminal conduct again.

5.    Conclusion

Roni understands that the conduct that led him to this point was wrong and illegal. He

has taken responsibility for that conduct and knows that he needs to change himself. He has

sought out the support of his family and the assistance of professional therapists.

The Honorable Harold Baer
December 14, 2007
Page 15

     For the reasons stated above, we respectfully request that the Court impose a split sentence of 12 months, with 6 months in prison and 6 months in home detention.

                            Respectfully submitted,

                            Susan E. Brune

cc:   Marc Berger, Assistant United States Attorney

Enclosures

19718

# Exhibit 1

December 13, 2007

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Baer:

I am writing this letter to express my deepest and most heartfelt remorse for what I did. Today I am a changed human being. I am a person who understands what he has done, and a person who requests forgiveness from all the people around him. I am terribly sorry for what I have done and the pain I have caused other people.

When I did the things I did I was head over heels involved in gambling and I couldn't find a way out. I couldn't stop my gambling. At first, I was playing blackjack and making money. But then people at the casino in Las Vegas showed me video poker. It became a problem fairly fast. Something in my brain, like a light, just turned on. I really got hooked. At the beginning I was winning, and I felt like I was on top of the world, like I was invincible. Everything was going my way so I did not think anything was wrong. It was a high I never had before. When I was playing video poker I felt less depressed. It is such a fast game and I was so involved that I did not have time to think about my other problems.

The good feelings only lasted when I was at the casino. During those thirty-six hours I was on a high. I barely slept. I ate very little. My adrenaline was in huge quantities. But then the crash came on the flight home. I was so exhausted that I often had problems just getting to the gate. I physically couldn't walk. Once I got on the plane the reality settled in and I went deeper into depression. When I got to New York I would go right to bed and sleep until 2:00 in the afternoon. I felt a huge battle inside of me, like a bomb waiting to go off. I was scared.

I felt so much shame that I did not tell anyone what I was doing. I am not a person who exposes himself too much, and so over the years I have learned to cover my feelings. I even kept my gambling from my wife Shirley. At the beginning, I would tell her that I was going to Las Vegas for interviews or seminars. As time passed she took it for granted that I was going once every three or four weeks. She believed it. She had no reason to suspect that I was gambling. It was a terrible thing to do to lie to my wife. When I think about it today it is a very sad thing.

Because of my gambling I have lost everything. Whoever looks at me today will never trust me again. Before I did these things I was considered a trustworthy person. That will never come again unless I prove myself. I have brought a lot of shame on my family; I

have betrayed my family and friends; I have ruined my business. I created a huge mess and then plunged everyone into it with me. I betrayed the trust and confidences of my clients. I came to them as one person, as a trustworthy person, but underneath it, in the end, I became someone else. And I used their trust to take their money to do things I never should have done. Thinking about what I have done drives me crazy. I cannot leave it alone. I have ruined everything that I have built over the last thirty years.

Since I was arrested I think a lot about what I did. I am trying to stay busy so that I don't think about gambling. I think very often about the family and the friends and the relationships I had before. Our lives have changed so drastically. I think a lot about how sorry and remorseful I am. I talk to my family and tell them how sorry I am but I know that is not enough. I am trying to show them that I made a terrible mistake, but that they should accept me with all my faults and understand that even from this terrible experience I will come out a better human being.

Without the support of my family I would not be alive today. When I first had to deal with the consequences of my actions, I contemplated suicide. If it were not for Shirley and my cousin Sylvia I would probably not be here today. They made it clear to me that suicide was not an option, that I needed to deal with reality and suffer the consequences for what I did. In the back of my head I still think about suicide, but I know that I cannot do that to my wife and children. I do not want to cause them anymore pain. They would have to deal with that for the rest of their lives. They have had enough.

In the months after my arrest, my family has taken me into their hearts and supported me unquestionably. They made it clear that I made a mistake, but they are helping me get through it. Shirley has been supportive and by my side throughout. We have been together for thirty years and, as hard as it is, we are going to get through this. It has been very hard on my children Liat and Oren. They do not like to talk about it, but it is clear that they are hurt. Still, they give me support and show me that they care in their own way.

Since my arrest I have been in therapy. For the first time in 52 years I am beginning to understand who I am and to put myself together. I am beginning to connect with my emotions. At first, the therapy was just a tool to help me deal with my gambling and my mistakes. But I am more than that. For the first time I have been able to analyze what I am doing and stop myself from being so impulsive. Now, before I jump in, I put my toe into the water.

I still have the urge to gamble, but therapy has helped me fight those urges. Sometimes on the weekends I think about gambling, because I used to gamble on the weekends. My brain will sometimes come up with an image of a casino and I can smell the smells of the casino. Those things are imprinted in my mind. When I hear a bell or the honk of a car it reminds me of the sounds of the slot machines. I used to hear planes flying overhead and think of flights to Las Vegas. I can feel the pull of the casino, but I know today that I cannot do that.

Therapy has taught me to fight these urges by focusing on the consequences of what I did. Instead of thinking of gambling as a pleasure, my therapy has taught me to think of what gambling has brought into my life and the pain and suffering I have caused to other people. My addiction will be a part of my life forever and something that I will have to fight for the rest of my life. I know that I will need therapy for the rest of my life. I have so many issues that I have never dealt with, and now is the time to deal with them, otherwise I will not consider myself a changed person.

It is my hope that in the future I can move on and become a contributing member of society. I want to get up every morning and go to work. I want to do good in the world, perhaps as part of a campaign against gambling where I could help people with problems like mine. For my family, I hope that they are able to come out of this terrible and awful time. I want to see my children get married and have children.

I am extremely sorry for what I have done. Sorry is an understatement. I have not yet found the correct word in this language to express my feelings: remorseful, shameful, begging for forgiveness. There is no way to express how sorry I am because what I did was absolutely horrendous. I hope I have been able to explain my remorse and that you will understand it and take it into account.

Sincerely,

Aharon Weichselbaum

Exhibit 2

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007


Dear Judge Baer:

My husband Roni is a good man.  We are married 29 years and know each other for 30 years.  Roni is a loving, devoted, supportive, and helpful husband.  He is a loving, devoted, and supportive father who adores his two children.  Our friends love him because he is a true friend, loyal, and sincere. If someone needed help, Roni would "take the shirt of his back" to help.  This is my husband.

Roni was raised as an Orthodox Jew.  We practice traditional Judaism at home.  Our children spent their elementary years of education in a Jewish Day School.  Roni strongly believes in two very important tenets of our religion: mitzvot (good deeds) and tzedakah (charity).

Roni is known to all in our circle as a man with a heart of gold.  Many years ago when his step-father was dying of cancer, Roni went home to Israel to help his mother cope with the impending death of her husband.  He was at her side for several weeks caring for, washing, and feeding his dying step-father.

Roni was by my side day and night when my father was dying of complications resulting from Alzheimer disease.  When my father was in hospice care, Roni sat with him and spoke to him so he wasn't alone.  He was there to comfort all of us when my father finally passed.

Roni is still helping me care for my mother who now resides in a nursing home.  She suffers from chronic depression.  She was hospitalized several times, and Roni was always with me there during visiting times.

Our children love their "abba" (Hebrew for dad).  They look to Roni for advice, help, support, and comfort.  He is always there for his children because they come first in his life.  He wants the best for his family.

You may think of course, that I am painting a picture of my husband as a saint, and of course he is not.  He is a human being, as we all are, with faults, capable of gross mistakes, errors in judgment.  Is Roni remorseful for what he has done?  He is painfully beyond remorse.  While in intensive treatment/therapy, he has come to realize the terrible, tragic consequences of his actions and their effects on his life, family and career.  Please know that no matter what, we love and support Roni because we know his goodness.  His absence from our family will be terribly painful, sad, and lonely.  Roni is

our rock, and we pray that his time away from us will be as short as possible and pass quickly.  My husband is my best friend and always will be.


Yours truly,

Shirley Buls Weichselbaum

# Exhibit 3

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007


Dear Judge Baer,


I am a 65-year-old single woman. My parents have been dead for 37 years. My only
brother died on January 2003. I have no children. Shirley Weichselbaum's mother is my
late father's first cousin. My father and his sisters sponsored the immigration of her
mother, her aunt, and uncles after WW2. Their first visit to our home after arrival was
one of the most moving events of my childhood. Earlier when my father was a boy in
Europe, Shirley's grandmother and grandfather took him in when his mother died until he
left for America to join his father. We have deep ties.

I first met Roni in Israel. Shirley was going out with him. They came to visit me in my
apartment, and I was invited to Roni's mother's house where I met some of his friends.

I wasn't at their wedding, which took place in the United States. I was still living in
Israel.

I kept in contact with them and saw them on subsequent visits here. When I returned to
the US in the early eighties, we continued to be in contact. Over the next twenty odd
years we became close friends. I frequently spend holidays with them and their children.
Whenever anything significant happened in my life, they are among the first people I talk
to.

My health problems began in the eighties. Shirley was in the last months of pregnancy
with Oren and wasn't able to travel, but they called me **every day** during my first
hospital stay.

As the years went by, I started to have more serious health problems. I was diagnosed
with Breast Cancer in 1993. Both Shirley and Roni were extremely supportive of me. I
remember Roni picking me up from my surgeon's office the day I had the staples
removed in order to take me home with him for Passover. I slept through most of the
Seder, but just being there made me feel better.

After the treatment and surgery, I was never quite the same. Roni and Shirley would
send food to me at times when I wasn't able to cook or shop. Although Shirley is my
actual cousin, their participation on my behalf was equal. As other surgeries occurred,
Roni would call to find out how I was doing. He offered to accompany me to different
medical appointments because he worked in the city. I prefer to go to doctors alone, so I
declined all these offers, but the idea that he was willing to "be there" was a great

comfort. When I needed a "compression sleeve" to control the lymphedema, which had developed in my right arm, due to cancer treatment, Roni, helped me pay for it. It cost hundreds of dollars. He also paid for a special mastectomy bra, because I mentioned that the physiotherapist said that my back needed more support. At the time, I wasn't covered for that either. It also cost a few hundred dollars. All this was before he started going to Las Vegas. He gave me a CD player because he knew that listening to music relaxed me and would help me get through the procedures. I was working part time, but not earning much and then I went on disability, all together not much of an income.

I have always felt very at home with Shirley and Roni. I love to talk to Roni about music. He has an encyclopedic knowledge of classical and operatic music. I have learned a lot about music from him, and he has shown great patience in imparting his knowledge to me.

We jokingly say that I am the "third" child in the family, albeit a rather elderly and infirm child. I know that if I need help, Roni will be there for me.

Over the years he has given me things I needed, and been there for the medical support family members give. He has kept me laughing at the often excessively bawdy jokes he can belt out in several languages. I know that his absence is going to be terrible.

After I was diagnosed with cancer, I asked Roni to be the executor of my will. I asked him not my brother who was alive at the time. My only property is the apartment I live in. But even more important to me was asking him to supervise my funeral when the time comes. He knows what has to be taken care of ritually. I know he would do everything, as I want it to be done, according to orthodox Jewish tradition. Now that he is going to prison for an unknown amount of time, I have felt very bad. I was relaxed about what would happen after my death because I knew I could depend on him to take care of everything. I often discuss other kinds of decisions with him. His comments about practical subjects are usually level headed and realistic.

Roni has been a wreck ever since he was arrested. He has had to face a lot of hard truth about himself and the effect his actions have had on his family. He has to tell his 85-year-old mother, what he did, knowing that she has a heart condition and does not see herself as the mother of a "criminal". Fortunately for him, his brothers and their adult children are supporting him emotionally, and will help him when the time comes to tell her.

He has gone into treatment with a therapist specializing in addictive behavior and with a psychiatrist who supervises his psychotropic medication. In the beginning, he talked about suicide. I had long talks with him about the logic of committing such an act and the lifetime consequences it would have on his children and Shirley.

I don't know if remorse is a strong enough term for what he has gone through since he "woke up." He is devastated. He realizes how selfish his behavior has been not only toward the people it hurt, but also how oblivious he was to the consequences his family

would have to deal with.  In my opinion, the therapy he has been in has had a big impact on him.  I judge that by the nature of his reactions to it.  It churns him up, because he is being forced to come to terms with his inadequacies, something I now understand he never did before.

I have spent a lot of time with the family during these past few months. Roni and I talk or email frequently.  I have tried to be supportive, but honest and realistic.  I have been given so much by him, I feel I am giving a little back.

Yours truly,

Sylvia Navon

# Exhibit 4

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Baer:

My father is the kind of man who would do anything he can, not only for his children and family, but for his friends and colleagues as well. He is nothing but supportive, caring, loving, generous and kind-hearted. From my earliest memory as a child, I can always remember my father telling me that he would always be there for me, no matter what, and that I can always come to him if ever I needed help, advice, someone to talk to, or a shoulder to cry on. Through high school and college, I grew to understand what having a father with this sense of moral character really meant.

As a young girl, getting the news that my step-grandfather, his step-father, passed away from cancer was the first time I had to deal with a loss in my immediate family. I remember walking into the kitchen and seeing my father crying. Through his tears, he explained to me and my brother what had happened and that in life, we have to deal with both the happy times and the sad times. I was shocked to see my father in such a state, but his being able to gather himself together and make sure his young children understood what had happened has been my image of the kind of caring and nurturing human being he is.

In my junior year of college at Syracuse University, I had to decide whether or not to study abroad in Italy for one semester. At the time, I was having difficulties getting along with my two roommates. Ultimately, these arguments led to their criticizing me and my character. I was devastated, and my confidence in going abroad to Europe for the first time by myself was completely shattered. I called home, hysterical, not knowing what to do. When my father answered the phone, he told me that whatever decision I made he would support me and be proud of me, and if I didn't feel ready to venture out on my own just yet, it was ok. He also told me not to let anyone break my confidence and self-esteem, and that if I ever felt I needed to get away or confide in someone, he should be the first person I go to. Advice like this may sound typical of what a father should say to a daughter, but for me it carries a lot of weight. My father's words were exactly what I needed to hear, to give me strength to make, what was at the time, the biggest decision of my life. I ended up staying at Syracuse and having my best semester there, both academically and socially.

Now at age 26, a grown adult, with a career managing an art gallery with new and demanding responsibilities, I still take my father's words to heart. On my worst days, I can still go to him, and talk to him, and reflect on the advice he has given me in the past. He is my rock.

In the past couple of months, I have borne witness to a great change in my father. Through therapy and analysis, I have seen him come to realize more about himself than he ever has before, what he has done, who he is, and how to bear the burden of the coming years. I have no doubt in my mind or heart that he is remorseful for what he has done. Not a day goes by where he doesn't tell me that he is sorry for what he has done.

Having your parent apologize to you for changing you and your family's life in such a way as he has, is the most heartbreaking thing I have had to deal with.

My father's absence in the time to come will be painful for our family and friends. At this time, I look toward the future, hoping that my father's absence from my life will be as short as possible, and that he will be able to see me grow in my career, get married and have children, his grandchildren. No matter what is decided in the coming months, I will, without a doubt, support and love my father. He is the only father I have, and his nurturing words of love, care and support are now mine to give back to him.

Yours truly,

Liat Weichselbaum

# Exhibit 5

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007


Dear Judge Baer:

My father can best be described as a man with both open arms and an open heart. Whether it is for my sister and me, my mother, or our family and friends, there has never been a situation in which my father hasn't helped us out and guided us in the right direction in life. He is a man who is insightful and has a good heart. There isn't a person we know who can deny my father's generous and caring nature. He is not only a father for my sister and me, but also one for our friends, many of whom have gone to him instead of their own parents for advice.

My father's ability to embrace others has definitely rubbed off on me and is one of my best traits. During his life, my father has helped out family members who have been sick, opened the door to his house, and practically given everything he had just so the people he loves would be comfortable living their lives.

There were many situations in my lifetime when my father acted to improve my moral and physical character in loving ways. One life lesson that sticks out in my mind was his advice to always keep an open mind about things, whether people, places, career opportunities, or just about anything else one can encounter in life. He always encouraged me to look beyond what is in front of me, and to encounter and embrace what life brings.

He encouraged both my sister and me to travel, and not be close minded, to look at what else is around us, and learn from both the good and bad things that are going on around the world. This is one of the most important things I believe a parent can teach his child, not to just take the straight route his life, but to make some turns; see what's out there before you decide to settle down on one thing. This is the best way for someone to really learn about himself. My route led me to extending my education to graduate school at NYU and to eventually starting a career in the music industry.

The past few months have definitely been hard for me, my family and my father. There is also no doubt in my mind that my father bears feelings of remorse. The desperate mental state my father was in at the beginning of this ordeal has changed for the positive, thanks to the help of both therapy and the loving family around him. But despite all the turmoil my father is going through right now, he still makes his top priority ensuring that his family's life is as smooth as it can be. That just shows you point blank what my father's character is like. While facing whatever is coming down the road for him, he is able to push that aside just to make sure both my sister and I, and my mother are able to live the lives we want to live.

Personally for me, not having my father around for the next few years will be extremely tough. I think about that subject every day since this ordeal began. I truly believe that the only way that both my family and I will survive through this tough time in our lives, is by relying on the foundations my father has given my sister and me. His

teachings of good character and love are deeply imprinted in us. We are all waiting for the day when we can put all of this behind us, and continue living our lives as the loving family we are, together with our loving father.

Yours truly,

Oren Weichselbaum

# Exhibit 6

# THE SCHOOL OF THE ART INSTITUTE OF CHICAGO

112 South Michigan Avenue • Chicago, Illinois • 60603-3103 • 312.899-5100

July 14, 2007

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Baer:

I am happy to write a note on behalf of Roni Weichselbaum; he is married to my wife's cousin, and over the years our two families have become close, and have visited together on many occasions. Much of this is due to Roni himself—he is an exuberant and thoughtful individual with a great gusto for life, and a great generosity of spirit. He entered fully into my and my wife's interests, and through his intelligent conversation and his many acts of personal kindness became a true part of our family. Roni's infectious laugh, his pleasure in the company of family, his affection for good discussion, his intellectual curiosity, and his love of new experiences all made him a leader in the things he did with us, and we are grateful to know him—he has changed our lives for the better. There are so many instances of his personal generosity, his thoughtfulness on my mother's passing, his patient attentiveness to my young daughter, his scrupulous attention to my family's comfort on our visits to his home, and his counsel when we requested it. He and his wonderful family, his wife Shirley and his children Liat and Oren, are a part of us now, and our hearts are always with them, in good times and bad.

Roni and I have had several extended conversations in the last few months, and I can attest to his profound remorse, and his determination to return to his family a changed man and one that will make a contribution to their lives and to society. He has accepted responsibility for his acts, understands their ramifications, and is sobered and chastened by them and accepts the challenges that lie ahead for him. I teach art history at college, and often with colleagues when discussing a student use a kind of shorthand, and ask one another if the student "gets it," by which we mean has that individual had an experience so profound that their outlook is changed forever, that they will move on from earlier behavior. Roni "gets it," and I know that he will return to us, his family, and to society ready to deal with what will await him. Of course, all of us look to the near future with some trepidation; I greatly appreciate your courtesy in permitting me to write you about my friend Roni Weichselbaum, and wish you well with your deliberations.

Sincerely,

James Yood
Art History, Theory and Criticism

# Exhibit 7

July 14, 2007


The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Baer:

My cousin Roni Weichselbaum is a warm, intelligent, and generous man.  My husband,
daughter, and myself have been so grateful to have him, his wife – my first cousin
Shirley, and their beautiful children, Liat and Oren -- in our lives.  They have all been
more then cousins to me, they have been like a brother, and a sister, and most importantly
the dearest of friends.   While I was very close with my extended family as a young girl
growing up in Brooklyn, time passes, parents sadly pass away, lives change, people
relocate. I moved to Chicago for school and lost touch with them.  Shirley and Roni took
the initiative – on the encouragement of Roni – of finding me again several years ago.
Since then we have grown very close, and have become the dearest of friends.  Roni has
been the magnet that brought us back together, forgetting previous ills, and finding a way
to create a new relationship founded on the past but moving forward with a shared
intellectual and cultural connection, always remembering birthdays, anniversaries,
sharing good times, but also being there for the hard times, the sad times.  When my
mother passed away Roni was there for me.  Roni and Shirley came to the funeral and
supported me, talked to me, and then called me often on the phone when I had to return to
Chicago.  He has also been a wise counsel to my daughter, offering her kind nurturing
words, and being a source of encouragement during these challenging preteen years.  He
has shown her great affection, like a loving uncle, spending time with her, talking to her,
finding out about her life, her school, her likes and dislikes.  It is clear that she cares for
him very dearly. She anticipated his recent visit to Chicago so much, imitating with
affection Roni's distinctive and infectious laugh, and when they were here she asked if
they could move into our basement so they could live nearer to us!   It has really been a
blessing to have such a loving person in our life.

I am so saddened by these current events and see the devastating affect on his life and his
family and I too feel that affect.  He has been a huge and wonderful presence in our lives
and I will feel his absence enormously.  It is so evident to me that he is hugely sorry for
his actions and greatly remorseful for the pain he has caused his family. I see him now as
a changed man. I also see how his therapy and recent interventions have helped him
understand about those abhorrent behaviors. That was not the man I knew, I knew him as
a kind and honest man who wants only to help, to make better, to improve the lives and

well being of others, and I look forward to the time where he can fully return to society and to those goals, and back into our lives.

Sincerely,

*Lorraine Peltz*

Lorraine Peltz

# Exhibit 8



# NEW YORK STATE PSYCHIATRIC INSTITUTE
1051 RIVERSIDE DRIVE, NEW YORK, NY 10032 • 212-543-5000

### JEFFREY A. LIEBERMAN, M.D.
DIRECTOR

July 19, 2007

The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: Ahron Weichselbaum

Dear Judge Baer,

I am a licensed clinical psychologist who specializes in the treatment of gambling disorders, and currently work at the Gambling Disorders Clinic at Columbia University/New York State Psychiatric Institute. I am writing in reference to Mr. Ahron Weichselbaum, whom I have been treating at the Clinic since December 18, 2006.

When I first saw Mr. Weichselbaum he had not gambled for approximately 4 weeks. During our first meeting, Mr. Weichselbaum discussed the events leading to his seeking treatment. He reported gambling throughout his life, but described the problem becoming significantly more problematic in the last couple of years when he began to play video poker. He described how his gambling was limited to Las Vegas, where he would fly approximately once a month, very occasionally accompanied by family and friends, but usually alone. As his treatment progressed, he was able to describe the hours prior to a trip: he would leave on the first flight after work, would only take a carry-on to avoid luggage delays, book the airplane seat closest to the door so he would not be delayed by other passengers deplaning, and quickly get through the airport to the awaiting car and be taken to the casino. He would drop off the suitcase in the room and without showering or freshening up after the trip, head to the casino for hours. It was during treatment that he was able to see how driven his behavior was, how irritable he became at any delays in his plans, and unpleasant if he encountered any obstacles. Throughout the flight, he reported thinking only about getting to the video poker machine. While in Las Vegas, his time was consumed with gambling. Even when accompanied by his wife or friends, he only met them for dinner if necessary, otherwise preferring to stay at the video machine. Given the amount of time and money spent gambling, the casino also facilitated free rooms, meals, and lines of credit. He reports it not being unusual to spend about $30,000 during one of these trips. The return flight to New York was reported as "stressful" and "depressing"... a "crash." During the flight the patient reported feeling guilty over the lost money and exhausted from the days of gambling with very limited food or sleep. He describes the experience as "an addict needing to get his fix."

This description is very consistent with the symptoms of pathological gambling included in the Diagnostic and Statistical Manual of the American Psychiatric Association. These symptoms include:

- Frequent thoughts of gambling
- Needing to gamble with more and more money to get the amount of excitement sought
- Becoming restless or irritable when trying to cut down or stop gambling
- Gambled to escape from problems or when feeling depressed, anxious, or bad about oneself
- After losing money, returning another day in order to get even
- Lying to family or others to hide the extent of the gambling
- Making repeated unsuccessful attempts to control, cut back, or stop gambling
- Going beyond what is strictly legal in order to finance gambling or to pay for gambling debts
- Risking or losing a significant relationship, job, educational, or career opportunity because of gambling
- Seeking help from others to proved the money to relieve a desperate financial situation cause by gambling.

On an assessment of these symptoms, Mr. Weichselbaum scored 24 out of 30 points, reporting each of these behaviors as "Often", except for trying to control gambling and seeking help from others, which he related to lack of insight as to how problematic the behavior had become and an unwillingness to let others know there was a problem.

Video poker, which is what Mr. Weichselbaum played, is recognized as a particularly addictive form of gambling. Studies have shown a strong correlation between video poker and gambling addiction. One study of gambling addicts in Nevada found: "Without doubt, video poker machines were the game of choice for the G[amblers] A[nonymous] members. Over two-thirds found the machines to constitute 'serious' problems for them."[1] Furthermore, while it often takes years for people to get addicted to other forms of gambling, those who played video poker typically became compulsive gamblers after only a year.[2] According to the Illinois Institute of Recovery: "Because of their immediate and effective reinforcement schedules, problem gamblers who regularly play these machines appear to progress into pathological gambling much faster than problem gamblers who only gamble at horse races, or other games that do not have such an immediate rate of gratification."[3]

---

[1] R. Keith Schwer, William N. Thompson, Daryl Nakamuro, "Beyond the Limits of Recreation: Social Costs of Gambling in Southern Nevada," 2003 Annual Meeting of the Far West and American Popular Culture Association, 18 February 2003, (5 June 2003).

[2] R.B. Breen and M. Zimmerman, "Rapid onset of pathological gambling in machine gamblers," *Journal of Gambling Studies*, Vol. 18, No. 1, 2002, (21 August 2003).

[3] See http://www.addictionrecov.org/qandagam.htm.

**Treatment Progress**

Mr. Weichselbaum has done well in treatment, attending sessions consistently and clearly working very hard to understand and change his gambling behavior. As previously stated, he had stopped gambling prior to entering treatment and has not gambled while in treatment. Treatment at our clinic consists of 10 weekly sessions of cognitive behavioral therapy followed by monthly maintenance sessions. The purpose of the treatment is to help the patient see the continuum of triggers-thoughts/feelings-behavior-consequences and develop effective ways of interrupting that continuum to stop gambling. As treatment progressed, Mr. Weichselbaum was better able to understand his gambling behavior and the legal problems it has brought him, as well as the devastating effects it has had on his family and finances. Mr. Weichselbaum is also seen by Dr. Raphael Campeas, a psychiatrist our clinic, for the treatment of depression. Treatment with Dr. Campeas consists of supportive psychotherapy and psychopharmacology.

Given Mr. Weichselbaum's level of gambling addiction, it is not surprising that he eventually committed the crimes that lead to his being before you. As with drugs, the addiction drives the behavior and in the pursuit of a "fix," the addict's judgment is often compromised. I believe that through his treatment, Mr. Weichselbaum has genuinely explored the consequences of his actions on his life and is remorseful over the impact of his actions on others.

Sincerely,

Ivan C. Balan, Ph.D.
NYS Licensed Clinical Psychologist
Gambling Disorders Clinic at Columbia University/New York State Psychiatric Institute

# Exhibit 9

07/19/2007  09:05    2125436515    PAGE  03

7/19/2007


The Honorable Harold Baer
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re: Aharon Weichselbaum

Dear Judge Baer:

    I am a psychiatrist who is currently treating Mr. Aharon Weichselbaum.  I have been a practicing psychiatrist for the last 23 years, working at the New York State Psychiatric Institute in the Anxiety Disorders Clinic and on the staff of New York Presbyterian Hospital and Columbia University, College of Physicians & Surgeons.

    I have been treating Mr. Weichselbaum since December 6, 2006 when he was diagnosed with Pathologic Gambling and Major Depressive Disorder.  I have been treating him with a combination of psychotherapy and Lexapro for his depression.  He has also been receiving cognitive behavioral therapy at the Gambling Disorders Clinic at Columbia University.

    When I first saw Mr. Weichselbaum, he was at the nadir of his depression, having finally recognized his pathological gambling problem for what it was and the impact that his disorder had had on his life.  Since our first meeting, Mr. Weichselbaum has taken his therapy both with me and at the gambling disorders clinic very seriously.  Mr. Weichselbaum has responded well to the Behavioral treatment and has ceased gambling.  His depression has responded partially to the combination of therapy and medication.

    Throughout his therapy, Mr. Weischselbaum has struggled to understand the pathology behind his actions and how he can reconcile these actions with his history of being a law-abiding citizen for the past fifty years. In my opinion, his Pathologic Gambling was the cause of his criminal behavior. Mr. Weichselbaum has worked hard to come to terms with the impact his pathology and its compulsive nature has had on his life.  He has struggled with the devastating impact his actions have had on his clients, his business, his friends and, most of all, his family.  He will continue to struggle with these issues for the rest of his life.  Mr. Weichselbaum is very remorseful for his actions.

Please let me know if I can be of further assistance to the Court.

Thank you

Raphael Campeas M.D.
Research Psychiatrist
New York State Psychiatric Institute

# Exhibit 10

---

**Page 13**

[1] **THE COURT:** I think those are the only items that I
[2] didn't hear the government mention that I wanted to be sure
[3] that we touched on. Have you been induced to offer to plead
[4] guilty by reason of any promises or statements by anyone to the
[5] effect that you would get leniency or special treatment or
[6] consideration if you pled guilty instead of going to trial?

[7] **THE DEFENDANT:** No, your Honor.

[8] **THE COURT:** Is there anything you want to ask me about
[9] this guilty plea that you're offering before we go further?

[10] **THE DEFENDANT:** No, your Honor.

[11] **THE COURT:** So is it fair to say that you're pleading
[12] guilty voluntarily and of your own free will and because you
[13] are guilty?

[14] **THE DEFENDANT:** Yes, your Honor.

[15] **THE COURT:** Maybe the government would give us a
[16] glimpse as well as represent that they have sufficient evidence
[17] for a prima facie case if they went to trial. A glimpse of
[18] their evidence.

[19] **MS. JUNG:** Your Honor, through documents and witnesses
[20] the government would show that the defendant was an employee of
[21] Paul L. Forchheimer, a small brokerage firm in lower Manhattan.
[22] The defendant was a signatory on bank and brokerage accounts.

[23] **THE COURT:** He was a what?

[24] **MS. JUNG:** A signatory, an authorized signatory. The
[25] government would also show that without his customer's

---

**Page 14**

[1] authorization or permission Mr. Weichselbaum sold securities
[2] that the customers owned and misappropriated the proceeds of
[3] those sales into his home bank account. The government would
[4] also show that Mr. Weichselbaum mailed to customers account
[5] statements that fraudulently reflected inaccurate account
[6] balances and positions that were no longer owned on behalf of
[7] those customers.

[8] **THE COURT:** And the charge is?

[9] **MS. JUNG:** Mail fraud, your Honor, in connection with
[10] the mailing of those fraudulent statements to the customers.

[11] **THE COURT:** Ms. Brune, do you have any valid legal
[12] defense that might prevail if he went to trial?

[13] **MS. BRUNE:** No, your Honor.

[14] **THE COURT:** Mr. Weichselbaum, what I need you to do
[15] now, if you want to continue with this guilty plea, is to tell
[16] me in your own words, including the elements of this mail fraud
[17] charge, what you did that brings you to this place in your life
[18] and causes you to offer to plead guilty. Let me remind you
[19] that you're under oath, so if you make a false statement you
[20] could be separately prosecuted for that. I just want to know
[21] what you did and I want to be sure that you in fact tell it to
[22] us in terms of including the elements of the crime that you're
[23] pleading to with some dates would be helpful, when it all
[24] began, et cetera, et cetera.

[25] **THE DEFENDANT:** On or about January 2001 through about

---

**Page 15**

[1] December 2006, I was an employee of Paul L. Forchheimer, Inc.,
[2] brokerage firm in Manhattan. I stole money from some of the
[3] firm's customers by cashing out their securities and
[4] transferring the money to my personal account. I then
[5] concealed my crime from these customers by sending them some
[6] false account statements. In one instance, on June 22, 2005, I
[7] sent an account statement through the U.S. Mail to Ernesto
[8] Riemann, a customer who lived in Switzerland, which indicated
[9] that he has significantly more assets than were actually in his
[10] account. I'm very sorry for what I've done. I know it was
[11] wrong and a crime.

[12] **THE COURT:** I presume that it's the government's
[13] position that these false account statements constitute the
[14] gravamen of the crime. If that's not true, you better tell me
[15] what is.

[16] **MS. JUNG:** Your Honor, that's accurate.

[17] **THE COURT:** I think that seems it includes enough
[18] of the elements to satisfy me. If the government wants to ask
[19] some more questions to make sure he knows what he's pleading
[20] to, that's all right with me, too.

[21] **MS. JUNG:** No further questions from the government,
[22] your Honor.

[23] **THE COURT:** I will accept your plea and find that you
[24] are fully competent and capable of entering an informed plea
[25] and that your plea is a knowing and voluntary one and is

---

**Page 16**

[1] supported by an independent basis in fact that contains the
[2] elements or at least the essential elements of the offense.
[3] And I guess the docket will reflect the guilty plea. I guess
[4] all we need now to do is set a date for sentence.

[5] **MS. JUNG:** Your Honor, if I may, sorry for
[6] interrupting.

[7] **THE COURT:** No. I'm finished. What do you want to
[8] say?

[9] **MS. JUNG:** I realize I don't believe, and I may be
[10] mistaken, whether or not the defendant was in any way forced or
[11] threatened. I know your Honor asked if there were any promises
[12] made apart from the plea agreement. I would respectfully ask
[13] the Court to inquire on that point.

[14] **THE COURT:** That's fine with me. You understand the
[15] question, concern?

[16] **THE DEFENDANT:** Yes, your Honor.

[17] **THE COURT:** What's your answer?

[18] **THE DEFENDANT:** No, your Honor.

[19] **MS. JUNG:** Thank you, your Honor.

[20] **THE COURT:** What's your date?

[21] **THE DEPUTY CLERK:** September 20 at 10:00. It's a
[22] Thursday.

[23] **THE COURT:** Let me suggest to you, Mr. Weichselbaum,
[24] that when you go to probation for your interview that you
[25] understand that while I'm delighted to read what I get from

---